# EXHIBIT 1

Case 1:26-cv-03675-VM    Document 1-1    Filed 05/04/26    Page 2 of 44

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

KRE8 360, LLC, and JOHN ZALLER,

                  Plaintiffs,

      v.

EXHIBITION HUB, INC., d/b/a
EXHIBITION HUB US CORPORATION,
EXHIBITION HUB US HOLDINGS, LLC,
and HAMZA EL AZHAR,

                  Defendants.

---

Index No: _____

**SUMMONS**

Plaintiffs designate New York County as the place of trial

The basis of venue is that it is the county where a substantial part of the events giving rise to the claim occurred

---

To the above-named Defendants:

       **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiffs' attorney at the address set forth below, within 20 days after the service of this summons (not counting the day of service itself), or within 30 days after service is complete if the summons is not delivered personally to you within the State of New York.

       **YOU ARE HEREBY NOTIFIED THAT** in the case of your failure to appear or to answer the complaint, a judgment will be entered against you by default for the relief demanded in the complaint.

DATED:     April 10, 2026
            New York, New York

                              Respectfully submitted,

                              **DENLEA & CARTON LLP**

                              *__/s/ Jeffrey I. Carton_____*
                              Jeffrey I. Carton, Esq.
                              Catherine H. Friesen, Esq.
                              2 Westchester Park Drive, Suite 410
                              White Plains, New York 10604
                              (914) 331-0100

                              *Attorneys for Plaintiffs*

Case 1:26-cv-03675-VM    Document 1-1    Filed 05/04/26    Page 3 of 44

To:

Exhibition Hub, Inc.
d/b/a Exhibition Hub US Corporation
Exhibition Hub Arts Centre
5660 Buford Highway NE
Doraville, GA 30340

Exhibition Hub U.S. Holdings LLC
Exhibition Hub Arts Centre
5660 Buford Highway NE
Doraville, GA 30340

Hamza El Azhar
c/o Exhibition Hub, Inc.
Exhibition Hub Arts Centre
5660 Buford Highway NE
Doraville, GA 30340

-2-

Case 1:26-cv-03675-VM    Document 1-1    Filed 05/04/26    Page 4 of 44

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| KRE8 360, LLC, and JOHN ZALLER,<br><br>                    Plaintiffs,<br><br>          v.<br><br>EXHIBITION HUB, INC., d/b/a<br>EXHIBITION HUB US CORPORATION,<br>EXHIBITION HUB US HOLDINGS, LLC,<br>and HAMZA EL AZHAR,<br><br>                    Defendants. | Index No: _____<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs KRE8 360, LLC, and John Zaller, as and for their complaint against Defendants

Exhibition Hub, Inc., d/b/a Exhibition Hub US Corporation, Exhibition Hub US Holdings, LLC,

and Hamza El Azhar (collectively, "Exhibition Hub" or "Defendants"), allege, upon knowledge

as to their own actions and upon good faith information and belief as to all other matters, as set

forth below.

## OVERVIEW OF THE ACTION

1.      This action seeks to redress the web of deceit, self-dealing, and abject fraud spun

by Defendants which, through an opportunistic and calculated plan of secrecy, partial truths,  and

a complex business and banking structure, took advantage of Plaintiffs' significant industry-

specific expertise,  excellent reputation, producing skills, and creative talent to deprive Plaintiffs

of the significant economic returns to which they are entitled in connection with a series of

internationally distributed, immersive experiences and exhibitions which have generated critical

and commercial acclaim, and generated hundreds of millions of dollars in revenue.

-3-

2.      For nearly twenty-five years, Plaintiff John Zaller has created, designed and produced enormously popular and impactful immersive experiences and exhibitions that allow visitors to step into new worlds and explore diverse subjects in three-dimensions through narrative-driven, scenically-rich, walk through environments that include detailed original writing and curation, original artifact curation, carefully selected props, theatrically styled sets, dramatic lighting, extensive soundscapes, audio tours, video content, projections, and VR experiences. Zaller has honed his unique skills of production, visual art and set design while working in the museum, entertainment, retail, and attractions/theme parks industries through his own immersive design firm, Plaintiff KRE8 360, LLC, that specializes in creating story-driven, traveling immersive experiences and brand activations.

3.      Zaller's unique talent set was readily apparent to Mario Iacampo, the co-founder with Defendant Hamza El Azhar of the European-based company known as Exhibition Hub, SRL. In 2019, Iacampo expressed interest in working with Zaller to bring *Van Gogh: The Immersive Experience* ("*Van Gogh*"), an immersive digital art experience involving the life and works of the artist Vincent Van Gogh, to the United States, and within a couple months, Zaller was actively pitching *Van Gogh* to his contacts. Zaller's initial collaboration with Iacampo eventually led them to form a corporation, Immersive Hub, Inc., for the purposes of partnering together to develop immersive experiences in the United States, and, later (after Iacampo and El Azhar decided to cut out Zaller as a co-owner of the US entity), to the signing of a Co-Production Agreement by Iacampo's new US based entity, Exhibition Hub Inc., d/b/a Exhibition Hub US Corporation ("Exhibition Hub"), and by Zaller on behalf of KRE8 360, LLC, for the purpose of co-producing immersive exhibitions featuring the lives and works of various artists ("the Co-Production Agreement").

-4-

4.      Pursuant to the Co-Production Agreement, Zaller agreed to render consulting services to Exhibition Hub to produce exhibitions that, like *Van Gogh*, feature the lives and works of various artists ("the Exhibitions"). In return, Zaller was to receive: i) a modest $5,000 monthly fee plus expenses, ii) 10% of profits of all US Exhibitions due to Exhibition Hub after partnership splits , and iii) an amount equal to 2.5% of the net profits of the Atlanta Exhibit (in addition to the 10%) known as *Van Gogh: the Immersive Experience*.

5.      Exhibition Hub's agreement to split profits with Zaller was the principal consideration on which Zaller relied in preparing to devote the Herculean effort that would be required of him to ensure the Exhibitions' success.  Profits were to be calculated based on revenues less certain expenses directly attributable to the exhibit and additional costs tied to each specific exhibit.

6.      In recognition of Zaller's role as a consultant (rather than as Iacampo's partner and co-owner in the business as the parties originally contemplated) and in order to protect Zaller's valuable time, talents and creative undertakings, the Co-Production Agreement expressly provided that Zaller's creative contributions with respect to the Exhibitions (as defined in the agreement) would be considered "works-for-hire" for Exhibition Hub, Inc., but that "For the avoidance of doubt, any designs, ideas, suggestions, concepts, notes and/or other contributions made by JZ [Zaller] other than those in connection with the Exhibitions shall not be considered Contributions and shall remain the property of JZ." (emphasis added).

7.      Through Zaller's tireless creative energy, practical know-how, and 24-7 passion for his work, *Van Gogh* opened in both Las Vegas and Atlanta in late spring, 2021, to critical and popular acclaim and over the next five years travelled to 28 US cities.  *Van Gogh* remains on exhibition, and is currently in North Carolina, with future cities in the pipeline, incorporating new

-5-

designs added by Zaller. To date, *Van Gogh* has generated in excess of $200 million in ticket sales and has been widely recognized as a commercial juggernaut.

8. Zaller and Exhibition Hub's collaboration continued thereafter, with Zaller creating and producing numerous immersive experiences that toured, as a result of Zaller's prodigious logistical feats, throughout the United States.

9. In addition to co-producing existing Exhibition Hub productions and providing input to new creative productions, Zaller also developed entirely new creative concepts for immersive experiences which Exhibition Hub produced. One such immersive experience created by Zaller, which told the story of the sinking of the Titanic in a striking new way, ultimately opened in 2024 as *Titanic: An Immersive Voyage* in Atlanta and Milan, and then toured nationally and internationally through 23 cities with more cities in active planning and rollout.

10. In the lead up to Titanic, Zaller also created another show, *Dino Brick Adventure*, from a collection of LEGO dinosaur sculptures sitting idly in a warehouse. Most recently, in the second half of 2025, Zaller developed four new creative immersive experiences: the content, scenography and curation (including video and replica artifacts) of a Dino VR show (*Dinoverse*), which opened in Atlanta in September, 2025; one based on the Seven Wonders of the World ("*Seven Wonders*"), which opened in London, in December 2025, one based on public fascination with serial killers ("*Mind of a Serial Killer*"), which opened in Dublin in early 2026, and is set to open in New York City in April 2026; and a new blockbuster concept called *Super Plush*, which will soon begin the design detailing phase.

11. In creating and developing these six exhibitions (collectively referred to as "the Works"), Zaller applied his imagination, knowledge, talent, judgment and skill to create unique immersive experiences for the viewing public. Accordingly, the Works comprise copyrightable

-6-

subject matter, and *Titanic: An Immersive Voyage, 2024, Super Plush, Dinoverse, Dino Brick Adventure* and *Mind of a Serial Killer* were later registered under the Copyright Act of 1976 § 101, et seq., as amended, ( "Copyright Act" or the "Act").

12. On a legal, organizational, and regulatory level, Exhibition Hub brought these immersive experiences to multiple U.S. cities through the creation of, to date, over 35 "shell" production companies (collectively, "the Production Companies"), most of which are owned by Defendant Exhibition Hub US Holdings, LLC, through a joint venture agreement by Defendant Exhibition Hub, Inc., and non-party Fever Labs, Inc., a ticketing and marketing company (the "JV venues") and the remainder of which operate outside the joint venture agreement (the "non-JV venues"). A list of the known Production Companies is attached hereto as Exhibit A.

13. The payments due to Zaller under the Co-Production Agreement were clear and incontrovertible, and Zaller's 2021 settlement statement showed that his profit share (both from the Atlanta *Van Gogh* exhibit and from the other venues) exceeded $2,000,000. Exhibition Hub soon fell behind on payments to him, but distracted by the demands of his job which included well over 200 days of travel per year and countless 12+ hour days, and reassured by his long-standing relationship with Iacampo, Zaller nonetheless chose to continue to work with Exhibition Hub with the expectation that he would eventually receive the arrears owed to him.

14. In March 2023, El Azhar emailed Zaller in response to his concerns about the ever-increasing arrears, acknowledged that Exhibition Hub still owed Zaller almost one million dollars for the 2021 financial year (not including Zaller's share of the Las Vegas profits which had not yet been calculated) and asked for his patience with the belated 2022 profit sharing statement which Zaller still had not received. In late April, 2023, El Azhar committed to a payment schedule to catch up on payments for 2021 and 2022. Although Zaller had unanswered questions about

-7-

whether his 2021 profit share had been correctly calculated and he had yet to see the final 2022 profit share statement, Zaller took the payments as a gesture of good faith and continued the work of building the company.

15. When Zaller finally saw the settlement statement for financial year 2022, it purported to show that his profit share had dropped significantly from 2021, in part because significant amounts were being withheld for "amortization" and "royalties." Zaller, who was surprised by the drop in the face of the Exhibitions' popularity and profitability, was warned not to question that practice even though it appeared to him that the amounts were being improperly calculated in order to reduce the profit share owed to him.

16. Following Iacampo's death in November 2023, El Azhar told Zaller that he wanted to keep working together under the Co-Production Agreement and promised to continue to make payments current. Upon information and belief, El Azhar, wanting to continue to exploit Zaller's services to Exhibition Hub but believing that Zaller's profit share payments for 2021 and 2022 were too high (even though they had been artificially suppressed), had no intention of following through on that promise: he only occasionally thereafter authorized payments to Zaller and Exhibition Hub's end-of-year accounting improbably purported to show that the profit share due to Zaller for 2023 had dropped steeply to less than $100,000, a familiar refrain repeated again in 2024 and 2025 despite the fact that the Exhibitions that had previously opened and were continuing to open through Zaller's relentless work ethic were generating millions of dollars in profits.

17. Over the next two and half years, Zaller devoted his time and talent to developing entirely new immersive experiences that he co-produced with Exhibition Hub, all the while crisscrossing the United States to perform the endless tasks required to launch Exhibition Hub's existing roster, which included finding venues, architects, and general contractors; negotiating

-8-

with landlords and city officials; booking museum venues; securing supplies and materials; training staff; and handling public relations. Zaller's work was indispensable to the functioning of Exhibition Hub's US operations and, in 2025, after insistence from his inner circle, El Azhar appointed Zaller to the position of Exhibition Hub's "Chief Creative Officer," promising (but then failing to deliver) a new contract with a compensation structure for his increased responsibilities.

18. Shockingly, despite all of Zaller's undisputed and indisputable contributions to the ongoing success of Exhibition Hub's extensive United States operations and the millions of dollars in profits that the Exhibitions have generated, Defendant El Azhar has kept Zaller in the dark and refused to share a proper accounting that details amounts owed to KRE8 360 under the Co-Production Agreement, has manipulated payments and made promises to induce Zaller to continue his services and to make creative contributions with no intention of compensating Zaller for his work, has broken promises to bring and keep current the payments owed to Zaller and KRE8 360, and has made no efforts to compensate Zaller for his contributions and responsibilities as Chief Creative Officer.

19. Equally shockingly, it has become apparent to Zaller that El Azhar and others have manipulated Exhibition Hub's domestic and foreign corporate structure and accounting practices to create a highly opaque interconnected web that deliberately obfuscates financial transactions, cuts Zaller off from any meaningful review of those transactions, and facilitates the transfer of money in a complex shell game inuring to their personal benefit and Zaller's loss.

20. Finally, adding deliberate insult to myriad financial injuries, Exhibition Hub and El Azhar have refused to recognize Zaller's intellectual property rights in the Works, to credit him as their creator or to pay him the royalties extended to other IP holders and have implausibly insisted

-9-

that such Works were created "for hire" under the Co-Production Agreement and that they are the property of Exhibition Hub.

21.     This action seeks to redress the shocking indifference with which Defendants have treated their contractual obligations and the naked avarice they have displayed in exploiting Zaller's creativity, zeal, and unique skill set, and to bring transparency to their accounting practices.  It is also brought to vindicate Zaller's rights to his intellectual property and to require Exhibition Hub to pay him the past and future royalties to which he is entitled.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over Defendant Exhibition Hub, Inc., d/b/a Exhibition Hub US Corporation, because Defendant Exhibition Hub, Inc. consented to this Court's jurisdiction over the claims in this case in the parties' Co-Production Agreement as alleged further below.

23.     This Court also has jurisdiction over Defendants Exhibition Hub, Inc., d/b/a Exhibition Hub US Corporation, Exhibition Hub US Holdings, LLC, and Hamza El Azhar because each Defendant transacts business within the state and/or has contracted anywhere to supply goods and services in the state.

24.     This Court also may exercise jurisdiction over Defendant Hamza El Azhar because he has committed a tortious act within the State of New York.

25.     Venue is proper in this Court pursuant to CPLR § 503(a) because the parties consented to venue in the Co-Production Agreement and this is the county in which a substantial part of the events or omissions giving rise to the claim occurred.

-10-

## THE PARTIES

26.    Plaintiff KRE8 360, LLC is a Georgia limited liability company with a principal place of business at 915 Crest Valley Drive, Atlanta, Georgia.  KRE8 360, LLC, specializes in creating story-driven, traveling immersive experiences.

27.    Plaintiff John Zaller is an individual residing in Atlanta, Georgia and is the sole member of Plaintiff KRE8 360, LLC.

28.    Defendant Exhibition Hub, Inc., d/b/a Exhibition Hub US Corporation, is a Delaware corporation with a principal place of business in Atlanta, Georgia.

29.    Defendant Exhibition Hub US Holdings, LLC, is a Delaware limited liability company with a principal place of business in Atlanta, Georgia.  Defendant Exhibition Hub, Inc., and non-party Fever Labs, Inc. are each 50% owners of Defendant Exhibition Hub US Holdings, LLC.

30.    Defendant Hamza El Azhar is an individual residing in Dubai, UAE and Brussels, Belgium.

## STATEMENT OF FACTS

### I.    John Zaller and Mario Iacampo Collaborate To Bring Exhibition Hub Immersive Experiences to Audiences Across the United States

31.    Plaintiff John Zaller has over two decades of experience creating touring exhibitions on a wide range of subject matters.  Zaller's original projects, which he created or transformed, include: *Titanic: The Artifact Exhibition* and its derivatives; *BODIES: The Exhibition*; *Star Trek: The Exhibition*; *Jurassic World: The Exhibition*; *REAL BODIES*; *Dinosaurs Around the World*; *Dialogue in the Dark* (enhanced for U.S. presentation); *Sea Monsters Revealed*; and *Hamilton: The Exhibition*. Zaller's original works in this field include: *Michelangelo: The Experience; SPY: The Secret World of Espionage*; *CRASH: An Exhibition to Save the Rhino*; *The*

-11-

*Science of Golf*; *Titanic: An Immersive Voyage* (2024), *Dino Brick Adventure*; *Dinoverse: An Epic Journey to the Jurassic* (2025); *Seven Wonders of the World: An Immersive Experience* (2025), and *Mind of a Serial Killer: The Experience* (2026).

32.    In 2012, Zaller first connected with Mario Iacampo, then the co-owner of BME Exhibitions, regarding Zaller's *Sea Monsters Revealed* exhibition, and the two discussed the possibility of pursuing creative projects together.

33.    In September 2019, Zaller reconnected with Iacampo, who was now the co-founder and co-owner of a Belgian company called Exhibition Hub, SRL which toured immersive experiences throughout Europe. Iacampo expressed interest in bringing Exhibition Hub's popular *Van Gogh* to the United States. Zaller was intrigued by the proposal, and began outreach to his museum and producer contacts.  Despite an initially tepid response from traditional venues and the disruption caused by the pandemic, Zaller persisted and continued the planning process.

34.    In an email dated March 28, 2020, Iacampo proposed the creation of a new company, Immersive Hub USA, to be 90% owned by Iacampo (as CEO) and 10% owned by Zaller (as vice-president and COO), with Exhibition Hub's co-founder, El Azhar, to serve as treasurer. Iacampo agreed that Zaller would "receive his fair share (10%) of any cash distributions to shareholders."  Without the promise of equity and the opportunity to participate in the financial success of the venture, Zaller would never have agreed to devote the human capital required of him to guarantee the project's prosperity *ex nihilo*.

35.     On July 16, 2020, following through on Iacampo's email, Zaller formed Immersive Hub, Inc. as a Georgia corporation under the ownership structure proposed by Iacampo, and in the late fall of 2020, began to devote significant time to developing the *Van Gogh* business plan. Eventually, after months of work, Zaller brokered a deal to bring *Van Gogh* to Area 15, an

immersive event space in Las Vegas, for an opening in April 2021. This agreement was signed with Immersive Hub, Inc., and generated approximately $1,500,000.00, which Iacampo and El Azhar used to fund the expanding business in the U.S. At the same time, Zaller continued negotiating to bring *Van Gogh* to a venue in Atlanta and, ultimately, an opening date of May 19, 2021, was set.

36.    Before Area 15 opened, and again before the Atlanta debut of Van Gogh, public interest in the project was unprecedented. Pent up consumer demand due to the pandemic led to a never-before-seen surge in pre-sale tickets that generated millions of dollars in revenues prior to any opening date. Given this influx of cash, and the clear demand for *Van Gogh* across the country, Iacampo's and El Azhar's approach toward Zaller changed. Consistent with Iacampo's favored "mushroom management" style (which he described as "keep them in the dark and feed them shit"), Iacampo did an end-run around Immersive Hub, Inc. behind Zaller's back and formed Exhibition Hub, Inc., through which he and El Azhar would operate Exhibition Hub in the United States under the same name as its European counterpart. Zaller, in the dark, still thought he had a 10% ownership interest in the US company regardless of its name, but he, in fact, did not.

37.    Despite Iacampo's double-cross, Zaller, who was committed to the success of the *Van Gogh* exhibition, began crisscrossing the country looking for suitable venues in Washington DC, Houston, Seattle, Philadelphia, New York City, and Boston, even as he continued the endless tasks involved in preparing the Atlanta venue for successful launch. The Atlanta *Van Gogh*, like the Area 15 *Van Gogh*, ultimately opened on time and successfully despite the interference of El Azhar and his associates who, at the time, displayed open antagonism to Zaller. The Atlanta exhibition sold close to 385,000 tickets and generated tens of millions of dollars in ticket revenues.

-13-

38.    Shortly after the launch of the Atlanta exhibition, and despite its success, Iacampo (again displaying his mushroom-management style) told Zaller that he was "changing the deal," that, contrary to their handshake agreement, Zaller would not be a 10% owner in the clearly successful US business, and that El Azhar would be sending over a contract styled as a draft co-production agreement. Not wanting to walk away from his sweat equity and creative investment, Zaller decided to consider the new offer. During their ensuing discussions, Iacampo agreed to a provision that carved out Zaller's new work and explicitly recognized that, should Zaller create new concepts produced by Exhibition Hub, ownership of these works would remain with Zaller.

39.    These negotiations eventually resulted in a signed Co-Production Agreement entered into by Exhibition Hub, Inc., d/b/a Exhibition Hub US Corporation ("EH") and KRE8 360, LLC ("JZ") on August 9, 2021.

## II.    The Co-Production Agreement

40.    The Co-Production Agreement was substantively different from and more limited in scope than Iacampo's email proposal, beginning with the recognition that "the Producers desire to co-produce and present one or more immersive exhibitions that are anchored by large scale digital media projections **that feature the lives and works of various artists** (the "Exhibitions")." (emphasis added).  Zaller agreed to render "consulting services" to the Exhibitions and, in return, he was entitled to receive: i) a modest $5,000 monthly fee commencing March 1, 2021, plus expenses, ii) an amount equal to 2.5% of the net profits of the Atlanta Exhibit; known as *Van Gogh*, *The Immersive Experience*, and iii) 10% of profits of all US Exhibitions due to Exhibition Hub after partnership splits. Profits were to be calculated "based on revenues less expenses **directly attributed to the exhibit**, as well as its share of office expenses, business development,

-14-

hotels, meals etc., amortization of materials, royalties to creators **attributed to the specific exhibit**." (emphasis added).

41. The Co-Production Agreement further provided that "EH and JZ will directly and through various parent, subsidiary, and affiliated entities present the Exhibitions (each a "Production Company" and collectively, the "Production Companies")" and guaranteed that Zaller would have "reasonable access to the books and records of each Production Company and have the right to receive an accounting with reasonable detail."

42. The Co-Production Agreement expressly provided that Zaller was an independent contractor, and not an employee of Exhibition Hub, and that "nothing herein shall be deemed to create a partnership, joint venture, or other similar relationship between EH and JZ."

43. The definition of "Exhibitions" was carefully crafted to ensure that, while Zaller could not launch a competing *Van Gogh* experience, his other creative works were not rolled up into the juggernaut Exhibition Hub had become in five short months. Importantly, with respect to ownership of materials, any of Zaller's creative contributions with respect to the Exhibitions (as defined in the agreement ) would be considered "works-for-hire" for Exhibition Hub, Inc., but that "**any designs, ideas, suggestions, concepts, notes and/or other contributions made by JZ [Zaller] other than those in connection with the Exhibitions shall not be considered Contributions and shall remain the property of JZ**." (emphasis added).

44. The Co-Production Agreement by its express terms thus provides that Zaller retains intellectual property in his own creative works other than those that featured the lives and works of artists. At the time that the Co-Production Agreement was executed, Exhibition Hub in the United States had only exhibitions "featuring the lives and works of various artists" (specifically Van Gogh and Monet), and Zaller routinely provided creative input to those productions as "work-

-15-

for-hire," including re-writing its content for the U.S. market, creating educators' guides, contributing to marketing materials, creating sales materials, reviewing and creating space planning, and expanding on the design of galleries or creating entirely new galleries to enhance their presentation.

45.    The Co-Production Agreement also provides that it is governed by and construed in accordance with the laws of New York State, and that New York state and federal courts have exclusive jurisdiction and venue for actions related to its subject matter.

### III. Exhibition Hub Repeatedly Breaches the Co-Production Agreement While Iacampo and El Azhar Engage in a Scheme to Defraud Plaintiffs

46.    Having entered into the Co-Production Agreement, Zaller threw himself into the creative and practical details of bringing immersive experiences to the public across the US. In August, 2021, the *Van Gogh* experience opened in Washington DC to tremendous success, eventually selling more than 600,000 tickets. Zaller received his first sizable profit participation payments in October, and a settlement statement later that year reflecting a total profit share due to Zaller of over $2,000,000. Zaller immediately questioned the amounts allocated for amortization and royalties which reduced his 10% profit share, but was told by Exhibition Hub's then-financial consultant (and now company CEO), Richard Brundle, not to question it unless he wanted to face backlash from El Azhar. The 2021 settlement statement also failed to account for Exhibition Hub's profits from the Area 15 *Van Gogh* exhibition in Las Vegas.

47.    Throughout 2021 and 2022, Iacampo, El Azhar, Zaller, Brundle, and other Exhibition Hub delegates were operating at a breakneck pace to capitalize on a "gold-rush" of interest in *Van Gogh* productions, and thereafter numerous limited liability companies were formed to operate as shell production companies at different venues across the United States. With money rolling in, new opportunities arose about which Zaller was kept in the dark: in November

2021, Iacampo and El Azhar, through Exhibition Hub, Inc., entered into a joint venture ("JV") agreement with Fever Labs, Inc., a ticketing and marketing company, to operate Exhibition Hub US Holding LLC, and agreed to put 11 more US cities on sale during 2021. Multiple additional limited liability companies were then created across the country to facilitate acquisition of local venues, with Zaller following El Azhar's and Brundle's instructions with respect to the individual entities while still being kept entirely in the dark about the larger corporate structure and its financial management. Ultimately, over thirty-five Production Companies were created (a list of which of those known to Zaller is attached as Exhibit A), plus a sprawling network of international production companies many of which tie back to the US entities.

48. Expanding far beyond the scope of Exhibitions covered by the Co-Production Agreement, some of these productions featured the lives and works of artists (such as Claude Monet, Gustav Klimt and LEGO-artist Nathan Sawaya) while others explored topics of scientific, historical or popular interest (such as the sinking of the Titanic, dinosaurs, bubbles, the Seven Wonders of the World and serial killers). Zaller's work to bring existing immersive experiences to new cities and venues encompassed every level of detail from creating detailed budgets, selecting new markets, finding venues, negotiating with landlords, engaging city officials, identifying architects and engineers, managing and securing permitting, orchestrating building renovations, branding, and ongoing venue maintenance, coordinating with installation crews, engaging and managing installation crews, scenic vendor identification, graphics management, staff management, marketing supervision, private event conceptualization, and public relations.

49. Zaller worked through 2022 at top speed, overcoming enormous obstacles to find venues for *Van Gogh* in Cincinnati, New Orleans, Raleigh, and Sacramento, among others. Zaller also engaged in venue scouting and negotiations in New York, Atlanta, Las Vegas, and other cities

-17-

as a result of Iacampo's plan to create longer-term venues for Exhibition Hub productions. For example, in mid-2022, after Iacampo located a dilapidated building in Doraville, Georgia, that seemed suitable for a five-year lease, Zaller personally undertook the work necessary to ensure an on time opening of the company's Monet exhibition at that venue.

50. By this point, the joint venture between Exhibition Hub and Fever had expanded to cover several parts of the world, but Exhibition Hub retained some non-joint venture locations in Europe, Cincinnati and Atlanta. Upon information and belief, Iacampo and El Azhar began manipulating Exhibition Hub's increasingly complex corporate structure to maximize personal gain, artificially suppress profits paid to Zaller and keep Zaller increasingly in the dark about how his profit share payments were calculated. Iacampo and El Azhar were aware that the venues, production companies and accounts that fell under the joint venture agreement with Fever were subject to audit, while the non-joint venture accounts were not. Upon information and belief, to avoid this scrutiny, at least one million dollars from Atlanta *Van Gogh* profits was transferred to Brussels in 2022 to purchase the building that became the Exhibition Hub Brussels corporate headquarters and was owned by Iacampo's son. Iacampo also transferred almost $400,000 from Atlanta *Van Gogh* accounts to his ex-wife. The roughly $400,000 was later reclassified as a "minor operating expense" and charged against Zaller's share of the profits. The million dollars sent to Brussels has never been repaid or properly accounted for, effectively erasing those sums from Zaller's profit share. Money from non-JV accounts was also used to fund costs of a long term venue in Toronto, which was also put in the name of Iacampo's son, again diminishing the profits due to Zaller under the Co-Production Agreement.

51. In addition to these transfers which improperly suppressed Zaller's profit share, the majority of the company's non-joint venture profits in 2022 were simply rolled into Doraville

-18-

venue improvements instead of being included, as they should have been, in the calculation of Zaller's profit share under the Co-Production Agreement. Notably, the 2022 financial statement – when Zaller finally received it in mid-2023 – again improperly included baseless deductions for "amortization" and "royalties" and purported to show that his profit share for 2022 was far lower than it had been in 2021.

52. By 2023, Zaller was identifying, preparing, and doing the permitting for all Exhibition Hub venues in the US, acting as a consultant on both exhibitions that featured the lives and works of artists (that fell within the scope of his Co-Production Agreement) and those that cater to scientific, historical or popular interest (which did not). But Zaller still had not been paid the total profit share he was owed for 2021, and, increasingly concerned with Exhibition Hub's ever-rising debt to him (as well as its failure to provide him with a 2022 financial statement), he contacted El Azhar to request that Exhibition Hub get caught up on payments. On March 22, 2023, El Azhar emailed a statement that showed Exhibition Hub still owed KRE8 360 almost a million dollars for financial year 2021, a total that El Azhar subsequently acknowledged did not include the profit share owing for the Area 15 shows. On April 28, 2023, El Azhar agreed in writing to a payment plan with $100,000 to be paid the following week and $25,000 to be paid weekly following the opening of Monet in Cincinnati and Van Gogh in Atlanta until "everything is settled."

53. Reassured that a plan was in place to make current Exhibition Hub's arrears, Zaller continued his work, temporarily setting aside his concerns over the 2022 financial statement which (when it was finally provided to him in mid-2023) showed a significant purported reduction in the profit due to him and as noted above, continued to reflect seemingly baseless deductions for amortization and royalty payments. In June, 2023, Zaller oversaw the opening of Exhibition Hub's

-19-

new exhibition called Bubble World (later changed to Bubble Planet) in Montebello, California. Bubble Planet was an unqualified hit and generated significant revenues. Despite its high capital investment, it paid for itself in each city where it opened and generated a significant profit. Zaller's work continued unabated; in the Doraville venue alone, he worked diligently to make sure that new experiences opened on time, including the *Art of the Brick Immersive* (in Spring of 2023), and *Tutankhamun: His Tomb and Treasures* (in the Fall of 2023). In Chicago, Zaller prepared the venue and oversaw the very complicated permitting process for a *Disney 100* non-immersive exhibition.

54. Following Iacampo's death in November, 2023, El Azhar met with Zaller and told him that he would like to continue working with him under the Co-Production Agreement and promised to continue bringing payments current. El Azhar, however, apparently believing that Zaller had already received "enough" profits from 2021 and 2022 and fully embracing Iacampo's "mushroom-management" style, undertook a plan with others to ensure that Zaller would not receive any more compensation than was absolutely necessary to entice him to continue performing his invaluable services to Exhibition Hub while dangling the possibility of sharing in future profits.

55. As a result, notwithstanding El Azhar's assurances, at the end of 2023, Zaller faced the same refrain he had in 2022: he still had not been fully paid the arrears Exhibition Hub conceded it owed KRE8 360, LLC under the Co-Production Agreement for 2021, he had been paid little toward his 2022 profit share, and his share of the 2023 profits (when finally disclosed to him) was again artificially suppressed by amortization and royalty payments grounded in fiction and other financial machinations and manipulations concealed from him, resulting in the false representation that he was now due less than $100,000 as his profit share. But Zaller was already

-20-

enmeshed in a new creative project in which he had decades of experience, and that he knew would be a success, which he pitched and brought to Exhibition Hub: an immersive exhibition based on the sinking of the Titanic.

## IV. Defendants Continue to Exploit Plaintiffs' Creative Abilities While Further Engaging in a Scheme to Defraud Them of Fees, Payments, Royalties and Other Compensation Which They Are Owed

56.     Zaller first proposed the idea of an Exhibition Hub production based of the sinking of the Titanic in September, 2022, and Iacampo and El Azhar greeted the idea with enthusiasm. Conscious of his intellectual property rights from the inception, Zaller knew he had to retell the Titanic story in an entirely different way.  Zaller developed an original concept that used smaller set re-creations as though guests were stepping in and out of movie-set like scenes to experience the chronological story of Titanic's conception, creation, and sailing. At the same time, he came up with the idea to use Titanic's wireless messages to and from other ships on the night of her sinking as a way to share Titanic's "final words" in real time.

57.     Soon after the initial pitch, El Azhar was already planning a pipeline of new openings where Titanic could be presented.  Over the next several months, Zaller used his extensive experience and reputation to identify and convince collectors to join the effort, create a budget, and create an immersive style concept that combined artifacts, set re-creations and immersive media and projection. In the process, Zaller worked closely with Exhibition Hub's set designer who executed his vision flawlessly.  Zaller also directed the Exhibition Hub graphic design team, and then set about curating the expansive collection he had assembled (more than 2,000 artifacts) into a display of nearly 300 artifacts for its initial openings in Atlanta and Milan which were scheduled for July and August of 2024. In Zaller's expert hands, these superficially disconnected artifacts became foundational elements in a comprehensive environmental narrative

-21-

that told the story of Titanic like never before. Zaller knew that set re-creations and media were important and key to this new approach, but his unique experience with collections also informed the overall design approach which would make this Titanic experience culturally relevant and inherently more appealing to the public.

58.    In addition to being the person ensuring the implementation of Titanic's design, Zaller wrote every word of the original Titanic panel copy and artifact label copy, and wrote the initial draft of the audio tour, which he then brought in a long-time colleague to polish and record. He also wrote initial copy related to the digital kiosks where guests could learn more about the passenger whose "boarding pass" they received when they entered the exhibition.

59.    Zaller holds the copyright to *Titanic: An Immersive Voyage, 2024*, Registration Number TX 9-578-052, in addition to registrations for *Super Plush,* Registration Number TXu 2-534-433, *Dinoverse,* Registration Number  TX 9-580-797, *Dino Brick Adventure*, Registration Number TX 9-581-463, and *Mind of a Serial Killer*, Registration Number TXu 2-536-297.

60.    Throughout this period of time, Zaller, who knew that Exhibition Hub paid its creators a 7.5% royalty (which amount was deducted from profits he received under the Co-Production Agreement), reasonably expected that he would also receive (minimally) a 7.5% royalty for his creative work used by Exhibition Hub not only for its exploitations in the United States but for every presentation around the world.

61.    As the opening date for *Titanic: An Immersive Voyage* in Atlanta approached, Zaller took on the additional roles of technical designer and production manager, producing all drawings to properly install the show, coordinating global shipping of various components, sourcing local crew, securing materials, and generally working night and day to see his vision come to reality.  A few days after the successful opening, Zaller flew to Italy to oversee the

-22-

installation of the *Titanic* graphics, case placement and artifacts in Exhibition Hub's Milan venue, tasks ordinarily handled by seasoned production and technical managers for significant fees, but which were undertaken by Zaller in the expectation that he would receive royalties from these productions.

**V. Zaller is Fraudulently Induced by El Azhar to Serve in a New Role as Chief Creative Officer for Exhibition Hub**

62. Near the end of 2024, El Azhar formed an executive team to manage Exhibition Hub, and, at the insistence of the Chief Production Officer and Brundle, asked Zaller to serve as "Chief Creative Officer" ("CCO"). El Azhar, again engaging in "mushroom-management," falsely told Zaller that he was working on a new contract for Zaller's role as CCO, and, with that assurance and the reasonable belief that he would receive substantial compensation for his service (as well as the payments he was still due under the Co-Production Agreement), Zaller accepted it. Zaller immediately took on his new responsibilities, while continuing to perform his previous role. At this time, Zaller still believed that El Azhar would make good on his previous promises to bring payments he was owned under the Co-Production current, although he still challenged the methodology by which those payments were calculated and deducted from his profit share, a challenge that took on new urgency when Exhibition Hub improbably claimed that his total profit share for 2024 (both JV and non-JV venues) was **zero**, even though the Exhibitions continued to be wildly popular and generate significant revenues.

63. In his new role as CCO, Zaller oversaw the rollout of several new *Titanic* exhibitions, including training new production managers, creating new content, curating artifacts, and drawing/approving floor plans. He also secured numerous venues for the company's existing productions including Knoxville, Tampa, Winston Salem, Wichita, Montreal, Oakland, and Bellevue. Zaller also acted as production manager for the Knoxville installation of *Van Gogh,* and

-23-

oversaw the openings of *Van Gogh* (with a new sunflower gallery created by Zaller) in Winston Salem, Tampa and Wichita.

64.    Prior to the end of June 2025, Zaller had secured enough venues in the U.S. that the business felt stable for the first time since Iacampo's death. In June 2025, the executive team, including El Azhar, Brundle, Zaller, the head of HR, and other colleagues met in Marrakech, Morocco.  At this meeting, the team, at Zaller's urging, set an ambitious schedule, which slated the company to open more than 80 exhibitions for the year. In addition, Zaller was encouraged to create two new Experiences: *Seven Wonders of the World*, and *Mind of a Serial Killer*. Despite El Azhar's continuing failure to deliver the promised contract for his services as CCO, Zaller agreed to undertake this challenge with the understanding that the intellectual property for these new Experiences (neither of which featured the lives or works of artists) would belong to him under the clear terms of the Co-Production Agreement and that he would receive customary royalites for his copyright.

65.    Over the next four months, Zaller locked himself away and created the *Seven Wonders* and *Mind of a Serial Killer* Experiences while still supporting the permitting and production needs of the touring exhibitions. He conceived both experiences, did all of the initial design conceptual work, and wrote every word that led to their creation. While others were brought on to execute Zaller's ideas, most of whom Zaller sourced through his own network, both concepts came to fruition as his own, original works of authorship, and have been filed with the United States Copyright Office for copyright protection. Zaller project-managed each step of fabrication, media production, interactive development, and graphic design and also oversaw the final two weeks of the installation of *Mind of a Serial Killer* in Dublin with an almost entirely local crew and did the press for *Seven Wonders,* which opened in London in December. *Mind of a Serial*

-24-

*Killer*, which opened to acclaim in Dublin, and is ranked 4.6 stars out of 5 on Google, is slated to open in New York City in April, and in Seattle and Germany in May. An aggressive roll-out, in keeping with El Azhar's speed to market approach, is planned for this Experience.

66. Exhibition Hub still has not shared the settlement statement for financial year 2025 advising Plaintiffs of the profit share amounts due to them. Based on recent communications with El Azhar and Brundle, however, it has become clear to Zaller that El Azhar has no intention of bringing past outstanding payments current, of providing the financial transparency to justify the egregious and accelerating plunge in the amounts purportedly due to Zaller each year under the Co-Production Agreement (in the face of an enormously profitable business, much of whose success is due to Zaller), of compensating him for the thousands of as-yet uncompensated hours he has spent in an Executive Producer role both prior to and following his formal assumption of duties as Chief Creative Officer, or paying him royalties for Exhibition Hub's use of the Works.

67. When Zaller recently again challenged the profit share numbers and royalty payments, El Azhar, after an initially non-committal response, praised Zaller for his work and then proposed yet another new deal in which Zaller would share in a guaranteed 2% of global EBITDA with a potential to share in up to 5% of global EBITDA. Having been the repeated victim of El Azhar's fraudulent inducements, Zaller left that meeting assuming that the proposed 2% (to the extent it was ever actually meant to be paid at all) would be heavily discounted – effectively committing him to endless work with a pay rate well below the value provided. Moreover, the EBITDA offer did nothing to erase the past amounts Exhibition Hub owed Zaller under the Co-Production Agreement and as royalties for its use of Zaller's intellectual property in *Titanic, Seven Wonders* and *Mind of a Serial Killer* and other Works.

-25-

Case 1:26-cv-03675-VM Document 1-1 Filed 05/04/26 Page 27 of 44

68. Other information confirmed his suspicions that he was being cheated: On February 25, 2026, Brundle candidly told him that the amortization numbers and royalties were "bullocks" and were numbers that El Azhar made up. Brundle also informed Zaller that El Azhar was treating all the profits from the Doraville venue, for which Zaller worked so hard, as outside of their Co-Production Agreement which further suppressed his profit share. Zaller also learned that Exhibition Hub's financial records reflected that a $100,000 payment had been made to him when, in fact, it had not.

69. On March 4, 2026, Zaller emailed El Azhar to request clarification on these and other financial matters, and noted the need for licensing agreements going forward to protect his intellectual property in the Works. On March 4, 2026, El Azhar responded by email, outrageously claiming that the ownership of the Works belonged with Exhibition Hub under the purported terms of the Co-Production Agreement, and asserting that all previous financial calculations, including the amortization figures, were correct. On a later telephone call, El Azhar admitted that the amortization figures were "round numbers," but effectively threatened Zaller not to ask for an actual accounting because the "real numbers" would allegedly be much higher in Exhibition Hub's favor, effectively erasing the majority of the remaining amounts that Exhibition Hub claimed (fraudulently) were all that Zaller was owed.

70. Upon information and belief, in the meantime, El Azhar's mushroom-management style and corporate shell game are continuing unabated, with El Azhar manipulating the cash flow and bank accounts of the JV and non-JV operations globally to advance his own personal interests while avoiding his promises and commitments to Zaller.

71. Zaller and KRE8 360, LLC now bring this action to vindicate Zaller's rights to his intellectual property, to seek an accounting of all sums due and owing KRE8 360, LLC under the

-26-

Co-Production Agreement and damages for the ongoing breach of Exhibition Hub's payment obligations under the Co-Production Agreement, to obtain financial redress for Exhibition Hub's and El Azhar's enrichment at Zaller's personal expense, and to hold El Azhar accountable for his fraud and self-dealing.

## CAUSES OF ACTION

### COUNT I
**Declaratory Judgment:** *Titanic: An Immersive Voyage: 2024, Super Plush, Dinoverse, Dino Brick Adventure & Mind of a Serial Killer*
**As Against All Defendants**

72.     Plaintiffs incorporate and re-allege each of the preceding paragraphs of the Complaint as if fully set forth herein.

73.     Plaintiffs contend, and Defendants deny, that the Works, including *Titanic: An Immersive Voyage: 2024, Super Plush, Dinoverse, Dino Brick Adventure* and *Mind of a Serial Killer* are the intellectual property of the Plaintiffs and that Plaintiffs are the exclusive copyright holders of the Works.

74.     Defendants contend, and Plaintiffs deny, that the Works, including *Titanic: An Immersive Voyage: 2024, Super Plush, Dinoverse, Dino Brick Adventure,* and *Mind of a Serial Killer* were "works for hire" and are the intellectual property of the Defendants.

75.     By reason of the foregoing, a present, ripe, and justiciable controversy exists between Plaintiffs and Defendants.

76.     Plaintiffs seek a declaration by this court that they, the creators of *Titanic: An Immersive Voyage, 2024,* Registration No. TX 9-578-052, are the exclusive owners of the copyright, in any and all versions and derivatives of *Titanic: An Immersive Voyage: 2024,* and have exclusive rights to distribute, publicly perform and display the copyrighted work.

-27-

77.     Plaintiffs further seek a declaration by this court that they, the creators of *Super Plush*, Registration No. TXu 2-534-433, are the exclusive owners of the copyright, in any and all versions and derivatives of *Super Plush,* and have exclusive rights to distribute, publicly perform and display the copyrighted work.

78.     Plaintiffs further seek a declaration by this court that they, the creators of *Dinoverse,* Registration No. TX 9-580-797, are the exclusive owners of the copyright, in any and all versions and derivatives of *Dinoverse,* and have exclusive rights to distribute, publicly perform and display the copyrighted work.

79.     Plaintiffs further seek a declaration by this court that they, the creators of *Dino Brick Adventure*, Registration No. TX 9-581-463, are the exclusive owners of the copyright, in any and all versions and derivatives of *Dino Brick Adventure,* and have exclusive rights to distribute, publicly perform and display the copyrighted work.

80.     Plaintiffs seek a declaration by this court that they, the creators of *Mind of a Serial Killer,* Registration No. TXu 2-536-297, are the exclusive owners of the copyright, in any and all versions and derivatives of *Mind of a Serial Killer,* and have exclusive rights to distribute, publicly perform and display the copyrighted work.

81.     Plaintiffs further seek a declaration that they are owed an accounting of all amounts collected by Defendants for *Titanic: An Immersive Voyage 2024, Dinoverse* and *Dino Brick Adventure* for the last three (3) years.

## COUNT II
### Breach of Contract
### As Against Defendant Exhibition Hub, Inc.

82.     Plaintiffs incorporate and re-allege each of the preceding paragraphs of the Complaint as if fully set forth herein.

-28-

83. The Co-Production Agreement is a valid, binding, and enforceable contract between KRE8 360 LLC and Exhibition Hub, Inc.

84. Plaintiff KRE8 360 LLC has performed in all material respects its obligations under the Co-Production Agreement.

85. Defendant Exhibition Hub, Inc. materially and repeatedly breached the Co-Production Agreement as set forth above.

86. Defendant Exhibition Hub's breaches (past and present) of its contract with KRE8 360, LLC, the Co-Production Agreement, have caused and are continuing to cause, damage and irreparable harm to Plaintiff KRE8 360 LLC.

87. Plaintiff KRE8 360, LLC, has no adequate remedy at law.

## COUNT III
### Breach of Covenant of Good Faith and Fair Dealing
### As Against Defendant Exhibition Hub, Inc.

88. Plaintiffs incorporate and re-allege each of the preceding paragraphs of the Complaint as if fully set forth herein.

89. In all contract agreements, including the Co-Production Agreement, the parties are obligated to act in good faith and to use their best efforts to deal fairly with one another,

90. Defendant Exhibition Hub, Inc. breached the covenant of good faith and fair dealing that is implied in every written contract by manipulating its accounting so as to minimize profit owed to Plaintiff KRE8 360, LLC.

91. Defendant Exhibition Hub's breaches of its contract with Plaintiff KRE8 360, LLC, the Co-Production Agreement, have caused and are continuing to cause, damage and irreparable harm to Plaintiff KRE8 360 LLC.

92. Plaintiff KRE8 360, LLC, has no adequate remedy at law.

-29-

**COUNT IV**
**Equitable Accounting**
**As Against All Defendants**

93.    Plaintiffs incorporate and re-allege each of the preceding paragraphs of the Complaint as if fully set forth herein.

94.    As set forth  above, Defendant Exhibition Hub, Inc., entered into a Co-Production Agreement with Plaintiff KRE8 360, LLC.

95.    The Co-Production Agreement provided that Exhibition Hub and Zaller would create Production Companies to present the Exhibitions.

96.    The Co-Production Agreement guaranteed that Plaintiffs would have "reasonable access to the books and records of each Production Company and have the right to receive an accounting with reasonable detail."

97.    To date, as set forth above, over thirty-five Production Companies have been created pursuant to the Co-Production Agreement, but Plaintiff Zaller has neither been privy to their books and records, nor received an accounting with reasonable detail.

98.    By reason of the foregoing, Plaintiffs demand an independent accounting by a certified public accountant of the books, records, invoices, and each and every transaction undertaken by Defendants for each Production Company listed in Exhibit A during the period described in this Complaint.

99.    Plaintiffs have no adequate remedy at law.

**COUNT V**
**Unjust Enrichment**
**As Against All Defendants**

100.    Plaintiffs incorporate and re-allege each of the preceding paragraphs of the Complaint as if fully set forth herein.

-30-

101. Plaintiffs had a direct relationship with Defendants.

102. Defendants benefited and continue to benefit at Plaintiffs' expense from services and efforts in connection with the consulting services provided by Plaintiffs to Defendants and by Plaintiff John Zaller's services as Executive Producer and Chief Creative Officer to Defendants.

103. Plaintiffs have not been compensated for the services they provided.

104. Equity and good conscience require that Plaintiffs receive restitution for their services and efforts in connection with the consulting services provided by Plaintiffs to Defendants and by Plaintiff John Zaller's services as Executive Producer and Chief Creative Officer to Defendants.

105. By reason of the foregoing, Plaintiffs are entitled to restitution in an amount to be determined at trial.

## COUNT VI
### *Quantum Meruit*
### As Against All Defendants

106. Plaintiffs incorporate and re-allege each of the preceding paragraphs of the Complaint as if fully set forth herein.

107. At the request and direction of Defendants, Plaintiffs furnished consulting services to and for the benefit of Defendants, fully expecting compensation for the same.

108. At the request and direction of Defendants, Plaintiff Zaller furnished services as Executive Producer for immersive and non-immersive shows to and for the benefit of Defendants, fully expecting compensation for the same.

109. At the request and direction of Defendants, Plaintiff Zaller furnished services as Chief Creative Officer to and for the benefit of Defendants, fully expecting compensation for the same.

-31-

Case 1:26-cv-03675-VM    Document 1-1    Filed 05/04/26    Page 33 of 44

110.    Plaintiffs furnished and provided these consulting services and Plaintiff Zaller furnished and provided services as Executive Producer and Chief Creative Officer in good faith.

111.    Defendants have received, accepted and enjoyed the benefits of the consulting services furnished and provided by Plaintiffs and the benefits of Plaintiff Zaller's services as Executive Producer and Chief Creative Officer.

112.    Plaintiffs expected compensation for their services.

113.    By retaining the benefits conferred by Plaintiffs without paying for same, Defendants should pay Plaintiffs for the fair and reasonable value of the services provided.

114.    It would be inequitable for Defendants to retain the benefits of the costs incurred by Plaintiffs for providing services without payment of the fair and reasonable value of same.

115.    Plaintiffs are entitled to recover the fair and reasonable value of the services provided to Defendants in an amount to be determined at trial.

## COUNT VII
### Fraud
### As Against Defendant Hamza El Azhar

116.    Plaintiffs incorporate and re-allege each of the preceding paragraphs of the Complaint as if fully set forth herein.

117.    On or about and between January 2021 through and about March 2026, Defendant El Azhar, together with non-party Mario Iacampo, formulated and executed a scheme to defraud Plaintiffs by deliberately suppressing profits paid to Plaintiffs through fabricated accounting practices and manipulation of the flow of money in a complex corporate structure, by inducing Plaintiffs to provide services with promises of payment which they had no intention of fulfilling, and by attempting to usurp and retain the benefits of Plaintiffs' intellectual property rights without compensating Plaintiffs for same.

-32-

118.    Upon information and belief, in furtherance of the scheme, non-party Mario Iacampo, with the  knowledge and agreement of Defendant El Azhar, transferred profits from Exhibition Hub Atlanta, LLC, to various foreign limited liability companies for the financial benefit of the family of non-party Mario Iacampo.

119.    In furtherance of this scheme, Defendant El Azhar caused Plaintiff John Zaller to rely on statements relating to Exhibition Hub's profits and losses, including but not limited to matters relating to amortization and royalties, that Defendant El Azhar knew to be untrue when they were made and said false statements were made with Defendant El Azhar's specific intent to cause Plaintiff John Zaller to detrimentally rely thereon, and John Zaller did rely on them to his detriment.

120.    In furtherance of this scheme, Defendant El Azhar caused Plaintiff John Zaller to rely on statements that Exhibition Hub would make payments due and owing to Plaintiff that Defendant El Azhar knew to be untrue when they were made and said false statements were made with Defendant El Azhar's specific intent to cause Plaintiff John Zaller to detrimentally rely thereon, and John Zaller did rely on them to his detriment.

121.    In furtherance of this scheme, Defendant El Azhar caused Plaintiff John Zaller to rely on statements that Zaller would be extended a new contract for his services as Chief Creative Officer, that Defendant El Azhar knew to be untrue when they were made and said false statements were made with Defendant El Azhar's specific intent to cause Plaintiff John Zaller to detrimentally rely thereon, and John Zaller did rely on them to his detriment.

122.    In furtherance of the scheme, Defendant El Azhar created and manipulated a deliberately opaque accounting system for a complex interconnected web of limited liability

-33-

companies to deceive Plaintiff Zaller and artificially suppress and conceal the profits, royalties and compensation which he is otherwise due.

123.    In furtherance of the scheme, Defendant El Azhar instructed and encouraged Plaintiffs to create new immersive experiences with the intent to usurp Plaintiffs' intellectual property rights in such experiences.

124.    As a result of Defendant El Azhar's fraud, Plaintiffs have sustained damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs respectfully request that the Court grant relief and enter judgment in its favor as follows:

A.    As to the First Cause of Action, issuing an order declaring that Plaintiffs have exclusive ownership of the copyright to *Titanic: An Immersive Voyage 2024*, *Super Plush, Dino Brick Adventure*, *Dinoverse*, and *Mind of a Serial Killer* in any and all derivatives, and have exclusive rights to distribute, publicly perform and display the copyrighted work, and are owed an accounting of all amounts collected by Defendants for *Titanic: An Immersive Voyage 2024, Dino Brick Adventure* and *Dinoverse*, for the last three (3) years;

C.    As to the Second, Third, Fifth, Sixth and Seventh Causes of Action, awarding Plaintiffs compensatory and punitive damages in amounts to be determined at trial;

D.    As to the Fourth Cause of Action, an order directing a full accounting of the Production Companies set forth in Exhibit A;

D.    Awarding pre- and post-judgment interest;

E.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees; and

-34-

F.      Awarding such other and further relief, in law and equity, as this Court deems just

and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:      April 10, 2026
            New York, New York

                                        Respectfully submitted,

                                        **DENLEA & CARTON LLP**


                                        __/s/ Jeffrey I. Carton_____
                                        Jeffrey I. Carton, Esq.
                                        Catherine H. Friesen, Esq.
                                        2 Westchester Park Drive, Suite 410
                                        White Plains, New York 10604
                                        (914) 331-0100

                                        *Attorneys for Plaintiffs*

-35-

**EXHIBIT A**

1. Exhibition Hub New York LLC
2. Exhibition Hub Wichita LLC
3. Exhibition Hub Miami LLC
4. Exhibition Hub Philadelphia LLC
5. Exhibition Hub Global Partners LLC
6. Exhibition Hub Huntsville LLC
7. Exhibition Hub Washington DC LLC
8. Exhibition Hub Spokane LLC
9. Exhibition Hub Worcester LLC
10. Exhibition Hub Little Rock LLC
11. Exhibition Hub LA Monet LLC
12. Exhibition Hub Denver LLC
13. Exhibition Hub California LLC
14. Exhibition Hub Chicago LLC
15. Exhibition Hub New Orleans LLC
16. Exhibition Hub Raleigh LLC
17. Exhibition Hub Virginia LLC
18. Exhibition Hub Sacramento LLC
19. Exhibition Hub VG Cities LLC
20. Exhibition Hub Doraville LLC
21. Exhibition Hub Florida LLC
22. Exhibition Hub Texas LLC
23. Exhibition Hub Tennessee LLC
24. Exhibition Hub Kansas LLC
25. Exhibition Hub Washington State LLC
25. Exhibition Hub Houston LLC
26. Exhibition Hub Dallas LLC
27. Exhibition Hub Tennessee LLC
28. Exhibition Hub Philadelphia LLC
29. Exhibition Hub Cincinnati LLC
30. Exhibition Hub Banksy New York LLC
31. Exhibition Hub Grand Rapids LLC
32. Exhibition Hub Boston LLC
33. Exhibition Hub Atlanta LLC
34. Exhibition Hub Schenectady LLC
35. Exhibition Hub Maryland LLC
36. Immersive Hub Operations LLC
37. Exhibition Hub LA Dinosaurs LLC
38. Exhibition Hub Merchandise LLC
39. Immersive Hub Global Productions LLC
40. Exhibition Hub Merch Management LLC

Case 1:26-cv-03675-VM    Document 1-1    Filed 05/04/26    Page 38 of 44

STATE OF NEW YORK SUPTREME COURT
COUNTY OF NEW YORK

-------------------------------------------------------------------x

KRE8 360, LLC, and JOHN ZALLER,                                    Index No.: 520594/2018

              Plaintiffs,

     v                                                           **AFFIRMATION OF SERVICE**

EXHIBITION HUB, INC., d/b/a
EXHIBITION HUB US CORPORATION,
EXHIBITION HUB US HOLDINGS, LLC,
and HAMZA EL AZHAR,

              Defendants.

-------------------------------------------------------------------x

State of New York, County of New York SS:

I, **Karl Rowe**, hereby affirm that I am not a party to the above action, and that I am over 18 years of age.

On **April 14, 2026,** at approximately **12:40 pm (EST),** I served the SUMMONS, COMPLAINT, and EXHIBIT A, in the above captioned action, upon **Hamza El Azhar (personally)** @ 50 Greene Street (3rd Floor) – New York, N.Y. 10013. Hamza El Azhar accepted the aforementioned documents.

Hamza El Azhar's approximate physical description is:

| | |
|---|---|
| Ethnicity: | Middle Eastern |
| Gender: | Male |
| Hair Color: | Brown |
| Eye Color: | Brown |
| Height: | 6' 2" |
| Weight: | 195 lbs. |
| Age: | 35 years old |

I affirm this 16th day of April, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Karl Rowe

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

KRE8 360, LLC, and JOHN ZALLER,
Plaintiff,

INDEX NO. 652165/2026

EXHIBITION HUB, INC, et al.
Defendant,

AFFIDAVIT

My name is CHRIS STANTON. I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Georgia. I have personal knowledge of the facts and statements contained in this affidavit and aver that each is true and correct. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude

Served EXHIBITION HUB, INC. on 4/14/26 at 12:36 PM. At Exhibition Hub Arts Centre, 5660 Buford Highway NE, Doraville, GA 30340. Served on General Manager, Katie Mulberry who stated she was expressly authorized to accept service. Katie Mulberry is a white female, 40s, 5 foot eight, 150 pounds with brown hair and glasses.

Documents:  Summons & Complaint

This  16  Day of  April  2026

Notary Public

Christopher Stanton

1 of 1

Case 1:26-cv-03675-VM    Document 1-1    Filed 05/04/26    Page 40 of 44

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

KRE8 360, LLC, and JOHN ZALLER,
Plaintiff,

INDEX NO. 652165/2026

EXHIBITION HUB, INC, et al.
Defendant,

AFFIDAVIT

My name is CHRIS STANTON. I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Georgia. I have personal knowledge of the facts and statements contained in this affidavit and aver that each is true and correct. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude

Served Exhibition Hub U.S. Holdings LLC on 4/14/26 at 12:36 PM. At Exhibition Hub Arts Centre, 5660 Buford Highway NE, Doraville, GA 30340. Served on General Manager, Katie Mulberry who stated she was expressly authorized to accept service. Katie Mulberry is a white female, 40s, 5 foot eight, 150 pounds with brown hair and glasses.

Documents: Summons & Complaint

This _16_ Day of _April_ 2026

_(signature)_                                              _(signature)_

**Notary Public**                                          **Christopher Stanton**

_(Notary seal: MARIA BORMANN NOTARY PUBLIC, DEKALB COUNTY, GEORGIA, MY COMMISSION EXPIRES JUNE 11, 2027)_

1 of 1



# REQUEST FOR JUDICIAL INTERVENTION

**SUPREME** ___ COURT, COUNTY OF **NEW YORK** ▾

UCS-840
(rev. 12/16/2024)

Index No: __652165/2026__     Date Index Issued: __04/13/2026__

| **For Court Use Only:** |
|---|
| IAS Entry Date |
| Judge Assigned |
| RJI Filed Date |

---

**CAPTION**     Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

KRE8 360, LLC, and JOHN ZALLER,

Plaintiff(s)/Petitioner(s)

-against-

EXHIBITION HUB, INC., d/b/a
EXHIBITION HUB US CORPORATION,
EXHIBITION HUB US HOLDINGS, LLC,
and HAMZA EL AZHAR,

Defendant(s)/Respondent(s)

---

**NATURE OF ACTION OR PROCEEDING**     Check only one box and specify where indicated.

**COMMERICIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ● Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (*specify*): _____

  **NOTE:** *For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the* **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).**

**TORTS**
- ○ Asbestos
- ○ Environmental (*specify*): _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (*specify*): _____
- ○ Other Negligence (*specify*): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**MATRIMONIAL**
- ○ Contested

  **NOTE:** *If there are children under the age of 18, complete and attach the* **MATRIMONIAL RJI ADDENDUM (UCS-840M).**
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (**UD-13**).*

**REAL PROPERTY**     Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (*specify*): ○ Residential  ○ Commercial
  Property Address: _____

  **NOTE:** *For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the* **FORECLOSURE RJI ADDENDUM (UCS-840F).**
- ○ Partition

  **NOTE:** *Complete and attach the* **PARTITION RJI ADDENDUM (UCS-840P).**
- ○ Tax Certiorari (*specify*):   Section: _____  Block: _____  Lot: _____
- ○ Tax Foreclosure
- ○ Other Real Property (*specify*): _____

**SPECIAL PROCEEDINGS**
- ○ Child-Parent Security Act (*specify*): ○ Assisted Reproduction  ○ Surrogacy Agreement
- ○ CPLR Article 75 – Arbitration  [see **NOTE** in **COMMERCIAL** section]
- ○ CPLR Article 78 – Proceeding against a Body or Officer
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 – Kendra's Law
- ○ MHL Article 10 – Sex Offender Confinement (*specify*): ○ Initial  ○ Review
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (*specify*): _____
- ○ Other Special Proceeding (*specify*): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution  [see **NOTE** in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change/Sex Designation Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (*specify*): _____

---

**STATUS OF ACTION OR PROCEEDING**     Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ● | ○ | If yes, date filed: __04/10/2026__ |
| Has a summons and complaint or summons with notice been served? | ● | ○ | If yes, date served: __04/14/2026__ |
| Is this action/proceeding being filed post-judgment? | ○ | ● | If yes, judgment date: _____ |

---

**NATURE OF JUDICIAL INTERVENTION**     Check one box only and enter additional information where indicated.

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice     Date Issue Joined: _____
- ○ Notice of Motion     Relief Requested: _____     Return Date: _____
- ○ Notice of Petition     Relief Requested: _____     Return Date: _____
- ○ Order to Show Cause     Relief Requested: _____     Return Date: _____
- ○ Other Ex Parte Application     Relief Requested: _____
- ○ Partition Settlement Conference
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Waiver of Court Costs, Fees, and Expenses
- ○ Writ of Habeas Corpus
- ● Other (specify): __Request for Assignment to Commercial Division__

1 of 2

**RELATED CASES** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties — List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants — For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined — For each defendant, indicate if issue has been joined. | Insurance Carriers — For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: KRE8 360 LLC  Role(s): Plaintiff | Denlea & Carton LLP, 2 Westchester Park Dr., Suite 410, White Plains, NY 10604, 914-331-0100, cfriesen@denleacarton.com | ○ YES  ○ NO | |
| ☐ | Name: John Zaller  Role(s): Plaintiff | Denlea & Carton LLP, 2 Westchester Park Dr., Suite 410, White Plains, NY 10604, 914-331-0100, cfriesen@denleacarton.com | ○ YES  ○ NO | |
| ☐ | Name: EXHIBITION HUB, INC., d/b/a EXHIBITION HUB US CORPOR  Role(s): Defendant | 5660 Buford Highway NE, Doraville, GA 30340 | ○ YES  ● NO | |
| ☐ | Name: EXHIBITION HUB US HOLDINGS, LLC  Role(s): Defendant | 5660 Buford Highway NE, Doraville, GA 30340 | ○ YES  ● NO | |
| ☐ | Name: HAMZA EL AZHAR  Role(s): Defendant | c/o Exhibition Hub, Inc., 5660 Buford Highway NE, Doraville, GA 30340, hamza@exhibitionhub.com | ○ YES  ● NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: ___05/04/2026___

_____
Signature

___2676518___
Attorney Registration Number

/s/ Catherine H. Friesen
Print Name

Case 1:26-cv-03675-VM    Document 1-1    Filed 05/04/26    Page 43 of 44



**New York State Unified Court System**

nycourts.gov

# Request for Judicial Intervention Commercial Division Addendum

UCS-840C (03/2025)
Page **1** of **2**
nycourthelp.gov

**Supreme Court**
**County of** NEW YORK

| | |
|---|---|
| **Plaintiff/Petitioner** (persons/entities that started the case): <br> KRE8 360, LLC, and John Zaller | **Index #:** <br> **652165/2026** |
| **Defendant/Respondent** (persons/entities the case is against): <br> Exhibition Hub, Inc. d/b/a Exhibition Hub US Corporation et al. | |

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g., unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g., sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; technology transactions and/or commercial disputes involving or arising out of technology; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code, excluding those concerning individual cooperative or condominium units

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions (without consideration of the monetary threshold)

☐ Commercial class actions (without consideration of the monetary threshold)

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g., directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures (without consideration of the monetary threshold)

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues (where the applicable agreement provides for the arbitration to be heard outside the United States, the monetary threshold set forth in 22 NYCRR 202.70(a) shall not apply)



| | | |
|---|---|---|
| **ADA Accommodations** <br> ada@nycourts.gov | **Spoken or Sign Language Interpreters** <br> interpreter@nycourts.gov | **COURT Help** 1-800-COURT-NY <br> (268-7869) |

**UCS-840C** (03/2025)          Page **2** of **2**          **Index #:** 652165/2026

Plaintiff/Petitioner's claim for compensatory damages, excluding punitive damages, interest, costs, and counsel fees claimed: $**25,000,000.00**

Plaintiff/Petitioner's claim for equitable or declaratory relief, including a brief description of the intended benefit, right being protected, or injury being averted through the equitable or declaratory relief sought and its monetary value:

An order declaring that Plaintiffs have exclusive ownership of the copyright to Titanic: An Immersive Voyage 2024, Super Plush, Dino Brick Adventure and Dinoverse, in any and all derivatives, and have exclusive rights to distribute, publicly perform and display the copyrighted work, and are owed an accounting of all amounts collected by Defendants for Titanic: An Immersive Voyage 2024, Dino Brick Adventure and Dinoverse, for the last three (3) years, the monetary value of which exceeds $25,000,000.00.

Defendant/Respondent's counterclaims:

- For counterclaims seeking monetary relief, provide a brief description of the claim, including the amount of compensatory damages sought, excluding punitive damages, interest, costs, and counsel fees claimed
- For counterclaims seeking equitable or declaratory relief, provide a brief description, including the intended benefit, right being protected, or injury being averted through the relief sought and its monetary value

Defendants have not yet answered the complaint.

I request that this case is assigned to the Commercial Division. I certify that the case meets the Commercial Division's jurisdictional requirements as set forth in 22 NYCRR 202.70(a), (b) and (c).

Date: **05/04/2026**

_____
Signature

**/s/ Catherine H. Friesen**
Print Name

2 of 2